(No. 53203.—

# CHARLES A. GETTO, Appellee, v. THE CITY OF CHICAGO *et al.*, Appellants.

*Opinion filed June 4, 1981.—Rehearing denied October 19, 1981.*

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke, Edmund Hatfield, and Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellant City of Chicago.

James R. Bryant, Jr., L. Bow Pritchett, R. Dean Irwin, and Michael J. Karson, of Chicago, for appellant Illinois Bell Telephone Company.

Arthur C. Thorpe, Stewart H. Diamond, and Jack M. Siegel (Klein, Thorpe & Jenkins, Ltd.; Ancel, Glink, Diamond & Murphy, P.C.; and Siegel & Stonesifer, Ltd., of counsel), for appellants City of Evanston, *et al.*

Sidney Z. Karasik and Leonard E. Handmacher, of Chicago, for appellee.

Richard G. Ferguson, Laurence D. Lasky, Paul W.

Schroeder, and William P. Suriano, of Chicago (Isham, Lincoln & Beale, of counsel), for *amicus curiae* Commonwealth Edison Company.

Robert A. Helman, Susan Getzendanner, Stephen J. Mattson, David K. Staub, and Richard J. Klein, of Mayer, Brown & Platt, of Chicago, for *amicus curiae* Northern Illinois Gas Company.

MR. JUSTICE WARD delivered the opinion of the court:

This case presents the second interlocutory appeal filed by the Illinois Bell Telephone Company (Bell) and the city of Chicago arising out of a class action suit brought against both parties in July of 1977 by Charles A. Getto. In this suit, filed on behalf of Getto and all persons similarly situated, the plaintiff challenged the method employed by the defendants in calculating the city's municipal message tax. This ordinance imposed a tax "upon all persons engaged in the business of transmitting messages by means of electricity at the rate of five per cent of the gross receipts from such business" originating within the corporate boundaries of the city of Chicago. In calculating the message tax, the defendants interpreted the term "gross receipts," upon which the tax was based, to include the total amount of income received through customer billing and other customer sources as well as the 5% message tax on these receipts.

This manner of taxation, it was argued, resulted in an illegal "tax on a tax." The burden of the tax was then passed on to Bell's customers pursuant to section 36(a) of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 36(a)), which permits utilities subject to a municipal message tax to collect, as an additional charge from their customers, an amount equal to the tax paid or any part of the tax. This section also allows the utility to impose an

additional service charge of 3% of the message tax on each subscriber to cover costs of accounting.

On December 19, 1978, the circuit court of Cook County held that the plaintiff, "for himself and on behalf of all other persons similarly situated," had standing to challenge the validity of the city's message tax; that the court and not the Illinois Commerce Commission had jurisdiction over the parties and subject matter of the case; and that the defendants' interpretation of "gross receipts" resulted in an "additional charge to Bell's customers [which was] unauthorized, illegal, irrational, unreasonably burdensome and oppressive to the plaintiff and the class he represents." Based on this the court allowed the plaintiff to maintain a class action. The court also entered a preliminary injunction ordering Bell to "set aside and segregate" that portion of the message tax receipts which exceeded the authorized 5% rate, as well as that portion of the accounting charge which had been erroneously imposed. As part of its order the court directed that any amount which should erroneously be collected contrary to the injunction should be deposited in a special protest fund to be administered and maintained by the court.

The defendants then filed their first interlocutory appeal in the appellate court under Rule 307(a) (73 Ill. 2d R. 307(a)), and this court granted direct appeal here under Rule 302(b) (73 Ill. 2d R. 302(b)). In *Getto v. City of Chicago* (1979), 77 Ill. 2d 346 (*Getto I*), this court held that since the actual burden of the message tax was borne by Bell's customers, the plaintiff class had standing to bring suit; that considering the limits on the Illinois Commerce Commission's statutory authority to provide an adequate remedy, the plaintiff was not required to exhaust his administrative remedies; that the circuit court and not the Commission had jurisdiction over the dispute; and finally that the defendants' construing the term

"gross receipts" to include the municipal message tax was "erroneous." The portion of the order of the circuit court appealed from was affirmed, and the cause was remanded for further proceedings.

Upon remandment to the circuit court, the plaintiff moved for and was given leave to join 105 additional municipalities and four other telephone companies as parties defendant. The plaintiff also filed six motions with the court requesting that the preliminary injunction issued on December 19, 1978, be made permanent; that the court appoint a trustee to take custody and control of the special protest fund; that a new definition of the class members in the suit, tendered by the plaintiff, be certified by the court; that the city of Chicago and Bell comply with all pending discovery requests; that the court appoint an accounting firm to conduct an audit of all message tax returns filed by Bell with the city since December 1, 1955, which was when the message tax ordinance was enacted; and that the court grant whatever further relief might be appropriate.

Both Bell and the city filed objections to these motions. The plaintiff later withdrew his motion seeking a redefinition and certification of the class and instead maintained that the class as certified by the court in its December 19 order was adequate. Bell filed an objection to this certification of the class.

On February 13, 1980, the circuit court ordered that the defendants be permanently enjoined from collecting that portion of the message tax in excess of the authorized rate; that the class be in effect recertified, thereby over-ruling Bell's objection; and that all parties comply with pending discovery orders. The court also appointed a trustee and an attorney for the trustee in order to admin-ister the special protest fund. Bell was ordered to turn over to the trustee all overcharges collected under the city's

message tax after July 18, 1967, that had not been previously deposited by the city with the trustee, including Bell's excess collection charges for accounting costs. This order adhered to the definition of the plaintiff class, which included all customers of Bell residing in Chicago and making utility payments since July 18, 1967. The court reserved ruling with respect to the appointment of an accounting firm for the purpose of conducting an audit and also with respect to the certification of subclasses involving the 105 municipalities and four other telephone companies joined as parties defendant. Upon denial of Bell's motion to modify this order, both Bell and the city filed notices of interlocutory appeal (73 Ill. 2d R. 307(a)). Subsequent to these filings the plaintiff and both defendants filed motions for direct appeal to this court which we granted. (73 Ill. 2d R. 302(b).) Briefs *amici curiae* have been filed in behalf of several utilities and municipalities.

The defendants first argue that the court's order allowing what they claim is "retroactive" relief from July 18, 1967, should be reversed. This argument is premised upon the size of the class as defined and certified by the court in its December 19 order and later in its order of February 13. The plaintiff class in these orders was defined as "[a]ll customers of Illinois Bell Telephone Company located or residing, in the City of Chicago, who during the period of ten years next before filing of the complaint herein on July 18, 1977, have paid to Bell a charge for the City's message tax in excess of the 5% rate authorized by law and who have accordingly been overcharged in the collection charge made by Bell during said period."

The defendants argue that between December of 1955 and July of 1977, when Getto filed suit, all utility payments to Bell were made without protest and that thereby any recovery is barred under what is described as the voluntary-payment doctrine. As a result, it is contended

46

that any recovery should be limited to the excess taxes paid by the plaintiff after the class action was filed in 1977.

The plaintiff, in response to this, first asserts that the issue of class certification was decided in *Getto I* and therefore is *res judicata.* In the alternative, he contends that the voluntary-payment doctrine does not apply since he did not have knowledge of all the necessary facts to support a finding that these prior payments were voluntary. Further he says that such payments were made under compulsion because of the threat of termination of his phone service, which, he argues, would also prevent application of the voluntary-tax-payment doctrine.

We first consider the plaintiff's claim that the question pertaining to the period for the recovery of refunds, that is, the period between July 18, 1967, and July 18, 1977, is *res judicata.* A review of the arguments made in *Getto I* and the opinion show that while the maintenance of the suit as a class action was contested in the trial court, that issue was neither raised nor decided on the appeal. Contrary to the plaintiff's position, that part of *Getto I* which held that the class had standing to file suit did not also affirm the trial court's certification of the class. The interlocutory appeal filed by the defendants challenged only the issuance of the preliminary injunction, and involved the questions of standing and the trial court's authority to exercise jurisdiction in the dispute. In discussing these issues as well as whether the defendants had correctly defined the term "gross receipts," this court did not have to consider the question of whether the class was properly defined and certified.

We are not convinced by the plaintiff's argument that this issue should have been raised on appeal in *Getto I* and that by their failure to do so the defendants are barred from raising the question of retroactive claims for refunds in this appeal. The preliminary injunction issued by the

court granted prospective relief only and did not require, as did the permanent injunction issued after *Getto I*, that excess payments since July 18, 1967, be deposited by Bell in the protest fund. Since the preliminary injunction only prohibited, prospectively, excessive collections by the defendants and did not involve the right to file the retroactive claims as described, the defendants were, of course, not obligated to raise that question in their first interlocutory appeal under Rule 307(a).

Too, the defendants were not entitled to challenge the circuit court's certification of the class when they filed their interlocutory appeal in *Getto I.* Our procedural rules affecting class action suits and interlocutory appeals are patterned on comparable Federal rules. Section 57.3 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 57.3), which closely follows Rule 23(c)(1) of the Federal Rules of Civil Procedure, provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it may be maintained and describe those whom the court finds to be members of the class. \*\*\*" This section also states, however, that "[t]his order may be conditional and may be amended before a decision on the merits." Federal courts, in interpreting procedural rules for class action and interlocutory appeals, have held that a party is not entitled to take an interlocutory appeal from a trial court order defining and certifying the class or from a determination as to whether the suit may or may not proceed as a class aciton since either order is always subject to amendment or modification before a final judgment is entered. See *Gardner v. Westinghouse Broadcasting Co.* (1978), 437 U.S. 478, 57 L. Ed. 2d 364, 98 S. Ct. 2451, and cases cited therein. See also *Frank v. Teachers Insurance & Annuity Association of America* (1978), 71 Ill. 2d 583, 590.

Similarly, there are decisions by Federal courts that

since an order granting or refusing a plaintiff's request to proceed as a class action does not terminate the litigation and has no impact upon the merits of the case, it may not be appealed as a final judgment. See *Coopers & Lybrand v. Livesay* (1978), 437 U.S. 463, 57 L. Ed. 2d 351, 98 S. Ct. 2454, and cases cited therein.

As of this stage of the action here, no final order or determination of liability has been made. The proceeding is at the discovery stage. As further evidence is presented, the court, in its discretion, may decide to amend or revise its determination of the class. Given the present posture of the case, the defendants would not have been entitled to challenge the trial court's definition and certification of the class in their interlocutory appeal under Rule 307(a) in *Getto I* and therefore the determination of the issue in this appeal is not barred under the doctrine of *res judicata.*

We turn now to the defendants' claim that payment of retroactive claims would be barred by the voluntary-tax-payment doctrine. This court has held that in the absence of a statute which allows recovery for the payment of those taxes or charges which have been improperly assessed by a municipality or utility, a taxpayer or customer may not recover taxes or fees which have been paid voluntarily. (*Ross v. City of Geneva* (1978), 71 Ill. 2d 27; *Adams v. Jewel Companies, Inc.* (1976), 63 Ill. 2d 336; *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52; *Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535.) Thus, a party may not recover taxes or charges voluntarily paid unless recovery is authorized by statute. In *Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535, 541, the voluntary-payment doctrine was rather fully stated:

"It has been a universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by

the person making the payment cannot be re-covered back on the ground that the claim was illegal. It has been deemed necessary not only to show that the claim asserted was unlawful, but also that the payment was not voluntary; that there was some necessity which amounted to com-pulsion, and payment was made under the in-fluence of such compulsion."

As has been stated, the defendants argue that since the plaintiff paid his utility bill without any protest until suit was filed in July of 1977, he may not recover funds for any overcharges paid prior to that time. Though pay-ment under protest is the typical means by which a tax-payer signifies his contention that a tax or charge was improper, the absence of such a protest does not, without more, require application of the voluntary-payment doctrine. It must also be shown that the taxpayer plain-tiff had knowledge of the facts upon which to frame a protest and also that the payments were not made under duress or compulsion.

The defendants, citing *Illinois Glass,* contend that the plaintiff is charged with knowledge of the message tax ordinance as well as those statutory provisions which allow a utility to pass along this tax to its subscribers by way of an increased charge for service. Bell further points out that this charge appeared separately on each utility bill to sub-scribers as required under the statute (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 36(a)) and thus no attempt was made to impose the fee upon unknowing subscribers.

Getto's phone bills, which were attached to his com-plaint, show three separate charges near the bottom of the bill for "U.S. Tax," "State," and "City." The State and city charges are each followed by an asterisk, which, in the lefthand margin of the bill, is explained as "Addi-tional charges due to State and City Taxes." We do not view this purported disclosure of "facts" to be sufficient

to warrant application of the voluntary-payment doctrine as the defendants argue, so as to preclude recovery for the earlier years in question.

Though the charge designated "City" does appear separately on the subscriber's bill, it is not stated which municipal tax is involved, or what portion of the bill is being taxed or that the charge includes a 3% charge on the message tax for costs of accounting. Too, with the information provided by his bill, the subscriber has no way of ascertaining that the message tax, which is passed on to him by Bell, was calculated by Bell by applying the 5% tax to the utility's gross receipts, which not only included customer billings, but other customer receipts and the message tax itself. This method of calculation was struck down as "erroneous" in *Getto I.*

The decision in *Illinois Glass* upon which the defendants importantly rely, rested on clearly distinguishable circumstances. There the Chicago Telephone Company was permitted by an ordinance adopted in 1889 to operate telephone lines for a period of 20 years within the corporate boundaries of the city of Chicago. The agreement was conditioned upon the company's agreeing not to increase the rates beyond those set out in a rate schedule filed with the city. The rate established for a business phone was $125 per year. The plaintiff entered into a contract with the company for business phone service at the prescribed rate. After several years of acceptable service, technical and mechanical difficulties arose "which made it difficult to carry on a conversation." (*Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535, 539.) The phone company investigated the difficulty and proposed that it could and would provide improved service but at an additional charge of $50 a year. That would increase the rate to $175 per year. Illinois Glass, after negotiations, finally agreed to the higher rate and continued to pay it for the next five years. It then brought suit to recover the

excess fees paid to the phone company. The court, observing that the contract for phone service was entered into by the plaintiff "deliberately, after negotiations and with full knowledge of all the facts and conditions ***" (234 Ill. 435, 540), held that the voluntary-payment doctrine was applicable.

Here, the utility rates and charges were established by the Illinois Commerce Commission and the city of Chicago, and not through negotiations between Bell and its subscribers. We do not consider that subscribers were here provided with sufficient information or "facts" to determine whether the method of taxation was proper.

Even were it to be held that the plaintiff had sufficient knowledge of all the facts to permit a conclusion that all payments prior to 1977 were voluntary, we judge that the implicit and real threat that phone service would be shut off for nonpayment of charges amounted to compulsion that would forbid application of the voluntary-payment doctrine. This question was addressed in *Ross v. City of Geneva* (1978), 71 Ill. 2d 27. There, the city of Geneva, which operated a publicly owned utility, levied a 10% surcharge on each subscriber's electrical bill to fund the acquiring and maintaining of parking facilities. Though the ordinance authorizing the addition of the surcharge was enacted in 1962, the charge did not appear separately on utility bills until June of 1973 and then only as a miscellaneous charge. The plaintiff filed a suit in July of that year claiming that the surcharge was illegal. The record showed that the city had a policy of terminating the electrical service of subscribers who failed to pay their bills and that there was no administrative provision for payment under protest. In the course of holding that the city was without authority to levy the surcharge, the court reviewed previous decisions which recognized that payments made under protest to avoid "disastrous effects to business" that would result from the termination of an

important service or the revocation of a license to conduct business were involuntary. This court held that "[c]onfronted with the choice of payment of the surcharge or termination of service, plaintiff, in making the payment, acted with prudence and is not barred [by the voluntary-payment doctrine] from recovery of the sums paid." (71 Ill. 2d 27, 33-34.) It was held that the plaintiff could bring a class action to recover all sums paid over the 13-year period involved.

The factor of compulsion and its place in the voluntary-payment doctrine were discussed in *Illinois Glass*. It was observed by the court in 1908:

> "The ancient doctrine of duress of person, and later of goods, has been relaxed, and extended so as to admit of compulsion of business and circumstances, and perhaps a telephone corporation having a system in general operation and connected with customers and other business houses might reasonably influence a business house to make an unwilling payment of an amount illegally demanded, which would make the payment compulsory. The telephone has become an instrument of such necessity in business houses that a denial of its advantages would amount to a destruction of the business." 234 Ill. 535, 541.

The defendants reply by arguing that under General Order 197, section 301(2) of the Illinois Commerce Commission, a privately owned public utility may not interrupt or terminate a subscriber's phone service when the customer has a legitimate dispute as to charges for service. Under this rule, in order to avoid a termination of service, it is said by Bell that the complainant need only pay the undisputed portion of the bill, and future bills, and seek to resolve his dispute with the utility. If the parties cannot resolve the dispute, the customer can then file a complaint with the Commission. Relying upon this general order, the

defendants argue that the plaintiff's phone service could not have been terminated and therefore the earlier utility service payments cannot be called involuntary. We do not consider the contention to be valid. That portion of the message tax in excess of the 5% authorized rate which was challenged in *Getto I* was sanctioned and approved by the Commission itself. This was one ground for this court's holding that it was not necessary for the plaintiff to exhaust his administrative remedies. Any attempt by the plaintiff to follow the procedural requirements in General Order 197 would obviously have been pointless and he would have been exposed to possible termination of service. We judge that the plaintiff is not barred under the voluntary-payment doctrine.

Bell raises an additional argument—that the plaintiff's action is barred under the doctrine of *laches.* As we consider that the plaintiff did not have knowledge of all the facts necessary to make a payment that was voluntary, *laches* is not applicable. See *Ross v. City of Geneva* (1978), 71 Ill. 2d 27, 34, and cases cited therein.

The defendants next argue that the supervision of refunds for excess utility rates or charges comes within the exclusive jurisdiction of the Illinois Commerce Commission. As a result, they contend the trial court's appointment of a special trustee to supervise and administer the protest fund was erroneous and should be set aside. A resembling argument was made in *Getto I* in connection with the defendants' position that a court of equity could not exercise jurisdiction over any dispute concerning a request for refunds arising under sections 36(a) and 76 of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, pars. 36(a), 76).

In *Getto I* the court stated that sections 36(a) and 76 of the Public Utilities Act did not provide an adequate remedy to the plaintiff since the Commission, under these provisions, had no authority to enjoin the continued im-

position and collection of the illegal portion of the message tax. The court said that "[u]nder these circumstances *** the circuit court properly exercised jurisdiction in this cause." (77 Ill. 2d 346, 357.) Though acknowledging that the Commission had no power to enjoin imposition of the tax, the defendants contend now that since this court in *Getto I* made it clear how the tax should be computed, the Commission may administer the refunding process.

As stated in *Getto I,* we do not consider that these sections of the Public Utilities Act provide an appropriate and adequate remedial procedure for the plaintiff. Nor are these sections properly applicable at this juncture of the proceeding. Under section 36(a) of the Act, examination of the question of whether rates or charges imposed by a utility are excessive may be had only when the utility files a supplemental schedule with the Commission. Such a schedule declares the new charges as a result of a utility's decision, under section 36(a), to impose an additional charge upon its subscribers to compensate for the tax levied upon the utility by a municipality under the message tax. As of this stage of the proceeding, Bell has filed a new supplemental schedule reflecting our holding in *Getto I* that the manner in which the message tax was computed was erroneous. This schedule has been approved by the Commission. No challenge to this revised schedule has been made by the plaintiff, and as it now reflects the rates and fees which may be legally charged, section 36(a) no longer provides a statutory means to obtain a refund.

The remedy possible under section 76 would not be adequate. Under it, the Commission's authority to determine whether excessive rates or charges have been imposed arises from the filing of a complaint. The complaint in this proceeding, as determined in *Getto I,* was properly filed with the circuit court and not with the Commission. Also,

this section is a limiting one, providing that "[a]ll complaints for the recovery of damages shall be filed with the Commission within one year from the time the produce, commodity or service as to which the complaint is made was furnished or performed ***." Ill. Rev. Stat. 1977, ch. 111 2/3, par. 76.

Bell also argues that the circuit court erred in ordering Bell to turn over to the trustee all overcharges collected by it since July 18, 1967, which have not already been deposited by the city of Chicago in the special protest fund created by order of the circuit court. Bell argues that, since it has already remitted those tax monies to the city, this court should order that the city and not Bell is responsible for all excess payments, including those made beginning in July 1967. That obviously would be improper. No determination whatever has been made as to liability for overcharges. Since the plaintiffs paid excess charges directly to Bell, we consider that the court did not abuse discretion in ordering Bell to deposit the amounts of overcharges with the trustee, excepting those excess charges already deposited with the trustee by the city pursuant to the court's order. This order did not represent any determination of liability by the circuit court.

For the reasons given, the orders of the circuit court of Cook County considered herein are affirmed.

*Orders affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE UNDERWOOD, dissenting:

Although the court acknowledged in *Getto I* the "complementary and interlocking nature" (*Getto v. City of Chicago* (1979), 77 Ill. 2d 346, 355) of the municipal message tax and the plaintiff's offsetting payments to Bell pursuant to section 36(a) of the Public Utilities Act (Ill.

Rev. Stat. 1977, ch. 111 2/3, par. 36(a)), the majority is here led to what seems to me the incongruous result of requiring Bell to pay over to the trustee money which was paid to it without objection between July 18, 1967, and July 18, 1977, despite the fact that this money was remitted to the city in the form of message tax at the time it was originally collected. This result is accomplished by ignoring *Adams v. Jewel Companies* (1976), 63 Ill. 2d 336, *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52, and the cases there cited. Those cases indicate that, in the case of similarly related use tax and retailers' occupation tax, one who voluntarily pays excessive tax to a retailer who, in turn, remits the corresponding tax to the taxing body, cannot, in the absence of statute, later recover the excessive tax.

While paying lip service, the majority today effectively abandons the voluntary-payment doctrine stated in *Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535, 541:

"It has been a universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal. It has been deemed necessary not only to show that the claim asserted was unlawful, but also that the payment was not voluntary; that there was some necessity which amounted to compulsion, and payment was made under the influence of such complusion."

(*Ross v. City of Geneva* (1978), 71 Ill. 2d 27; *Adams v. Jewel Companies* (1976), 63 Ill. 2d 336; *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52; *Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535.) First, failure to protest payments voluntarily made during the 10-year period is excused on the ground of lack of knowl-

edge that the amounts had been erroneously computed even though no inquiry had been made and the contents of public records would have disclosed the method of computing the overcharge. Even *Ross v. City of Geneva* (1978), 71 Ill. 2d 27, on which the majority relies, is distinguishable, since there the surcharge complained of was protested as soon as it was shown on the bill as a miscellaneous charge. In the present case payments were made without protest during the 10-year period, despite the fact that the charge was shown on customer bills under the heading "City," with a footnote explaining that it was an additional charge due to city taxes. Second, and more importantly, the majority relies on the possibility that the plaintiff labored under an unrealistic fear of termination of service as sufficient to show that the payments were made under compulsion. The fact is, however, that such termination would have been directly contradictory to the orders of the Illinois Commerce Commission prohibiting termination where liability is disputed. Again, *Ross* is distinguishable, for there the defendant had an established policy of terminating the service of those who refused to pay the challenged surcharge. Fears which the majority imputes to the plaintiff are made no more reasonable by the fact that the commission staff was involved in devising the incorrect method of computing the charge, especially since there is no evidence that plaintiff was ever aware of that involvement. (*Getto v. City of Chicago* (1979), 77 Ill. 2d 346, 360-63) (Underwood, J., dissenting).) If unreasonable beliefs can provide sufficient compulsion to excuse otherwise voluntary payments, the voluntary-payment doctrine no longer exists.

The doctrine of *laches* (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547) would provide a second reason to deny the plaintiff relief concerning amounts collected during the period from July 18, 1967, to July 18, 1977. The ordinance imposing the message tax was enacted in 1955, as were pro-

visions corresponding to section 36(a) of the Public Utilities Act. Although any recovery will apparently be limited to the 10-year period preceding filing of the complaint in this case, the erroneous computations of taxes and collection fees had been performed each month for 22 years before plaintiff filed this class action, and the collected taxes were presumably paid to the city by Bell during each of those years. If retroactive recovery is permitted there will be obvious and substantial financial prejudice to the city and the utility, which long ago expended the funds resulting from the now challenged computations.

Having ignored the doctrine of *laches,* and having decided that the voluntary-payment doctrine did not preclude recovery of sums paid prior to July 18, 1977, the majority approves the circuit court's order that Bell deposit with the trustee amounts collected during that period, less whatever amounts had been deposited by the city. Similar action by the appellate court in *Hagerty* was condemned by this court:

"We do not approve the appellate court's statement that:

'If defendant collected excess taxes from its customers, it has received and has retained the excess money to which it is not entitled. The fact that defendant may have paid a similar amount of money to the State is of no importance when considering the rights and obligations between defendant and its customers. Any money defendant may have paid to the State was in discharge of its own obligations and does not affect the rights of plaintiff and the class. When defendant retained the tax collected from plaintiff, it was unjustly enriched to the extent to which the tax collected exceeded the amount of tax that it could rightfully collect.' 14 Ill. App. 3d at 43.

This reasoning misapprehends the interrelation between the use tax and the retailers' occupation tax. (See *Turner v. Wright* (1957), 11 Ill. 2d 161.) If GM erroneously paid a retailers' occupation tax to the State on the same transaction in which it erroneously collected a use tax from the plaintiff, it was not enriched at all, justly or unjustly. If there was unjust enrichment, it was the State that was enriched." *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52, 60.

To date, as the majority acknowledges, "No determination whatever has been made as to liability for overcharges." (86 Ill. 2d at 55.) Bell has admittedly paid to the city all of the collected taxes, retaining only the collection charge provided by section 36 to compensate it for its services in collecting the tax. Under the majority's approach to this case, Bell can rationally be required to pay to the trustee of the fund that portion of its collection charge which had been improperly computed. There is, however, in my judgment, no defensible basis upon which Bell may also be required to pay the trustee the improperly computed amounts of tax which it had already paid to the city during the intervening 10 years. If those funds are to be paid into the fund at all, payment should be required from the city to which it was paid. The ordinance required Bell to pay the collected taxes to the city. It did so for 22 years. Now, it is for the first time claimed that the tax was incorrectly computed, and that both the amount of the city's tax and the amount of Bell's collection fee are higher than authorized. Requiring Bell to pay into the protest fund the disputed portion of its retained fees is one thing, but compelling it, instead of the city to which the taxes have been paid, to pay into the fund the amounts of tax previously remitted to the city during the 10-year interval, is, it seems to me, totally unjustified. That action may well pose substantial due process prob-

lems in addition to being directly contrary to *Adams, Hagerty,* and the cases there cited.

Whether the utility's future customers or the city's taxpayers, or both, bear the burden of the 10-year refund which appears to be contemplated by the trial court and a majority of my colleagues depends, of course, on whether the majority will permit Bell to eventually recover its duplicate payment from the city, a question the majority refuses to decide now. This anomalous situation typifies the problems resulting when retroactive recovery is permitted of taxes paid without protest for an entire decade.

I would limit recovery here to post-complaint-filing payments of the overcharges.

MR. JUSTICE RYAN joins in this dissent.